**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-5237

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

FARAH NAZ,

*Appellant*,

v.

JENNIFER M. GRANHOLM, SECRETARY OF THE
U.S. DEPARTMENT OF ENERGY,

*Appellee*.

---

On Appeal from the United States District Court
for the District of Columbia (Judge Dabney L. Friedrich)

---

**REPLY BRIEF OF COURT-APPOINTED *AMICUS CURIAE*
IN SUPPORT OF APPELLANT**

Anthony F. Shelley
  *Counsel of Record*
Cody F. Marden
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Black Live Matter Plaza
Washington, DC 20006
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
ashelley@milchev.com
cmarden@milchev.com

November 6, 2024                    *Court-Appointed Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT .......................................................................................................3

I.    MS. NAZ SUCCESSFULLY ALLEGED THAT SHE WAS RETALIATED AGAINST BECAUSE OF HER PROTECTED ACTIVITIES ........................................................................................3

II.   MS. NAZ SUCCESSFULLY PLED THAT HER TERMINATION WAS DISCRIMINATORY ..............................................................9

III.  MS. NAZ SUCCESSFULLY PLED THAT SHE WAS DENIED PROMOTIONS DUE TO DISCRIMINATION ...........................................12

      A.    Ms. Naz Was Denied an "Automatic" Step Increase .........................12

      B.    Ms. Naz Was Denied Opportunities for Promotion ...........................14

      C.    Ms. Naz Was Denied Transfers ..........................................................15

CONCLUSION .................................................................................................16

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ................................. *post*

CERTIFICATE OF SERVICE ......................................................................... *post*

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                      **Page(s)**

*Babb v. Wilkie*,
    589 U.S. 399 (2020)...................................................................................8, 11

*\*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)...................................................................................8, 11

*Chambers v. Dist. of Columbia*,
    35 F.4th 870 (D.C. Cir. 2022)...........................................................................15

*Erickson v. Pardus*,
    551 U.S. 89 (2007)...................................................................................13, 15

*\*Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*,
    52 F.3d 373 (D.C. Cir. 1995)...........................................................................5, 14

*Morgan v. Fed. Home Loan Mortg. Corp.*,
    328 F.3d 647 (D.C. Cir. 2003)............................................................................14

*Taylor v. Small*,
    350 F.3d 1286 (D.C. Cir. 2003).........................................................................12

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)...................................................................................8, 11

**Statutes**

5 U.S.C. § 5335.........................................................................................12

42 U.S.C. § 2000e-16...................................................................................3

**Other Authorities**

5 C.F.R. § 531.404......................................................................................12

## SUMMARY OF ARGUMENT

I.      Drawing all inferences in her favor, Ms. Naz successfully alleges that she was retaliated against by Defendants-Appellees for engaging in activities protected by Title VII.  As alleged, Ms. Naz began to experience years of discrimination and reprisals shortly after she testified against her immediate supervisor in a colleague's racial discrimination case.  This pattern of retaliatory discrimination eventually led to her termination.  The Government argues that Ms. Naz's termination cannot have been retaliation against her because she was fired years after she testified against her supervisor.  This ignores, however, that Ms. Naz allegedly experienced a continuum of discrimination that build on itself over multiple years.  As alleged, Ms. Naz was a model employee for 17-years before testifying against her supervisor, which led to a sudden series of retaliatory acts, including *inter alia* denied trainings, unfair poor performance reviews, and denied promotions.  In response to these reprisals she engaged in other protected activities, including filing two separate EEO complaints against two supervisors, which led to yet more reprisals.  Ms. Naz testimony against her initial supervisor was also the "but-for" cause of her ultimate termination.  Had it not been for that supervisor's discrimination, it is reasonable to infer that none of the subsequent discrimination she experienced would have occurred.

II.     Similarly, Ms. Naz successfully alleged that she was discriminated against on account of her race, sex, religion, and national origin in violation of Title VII.  Ms. Naz worked with her immediate supervisor without complaint for more than a year when Ms. Naz made the decision to testify against her in a colleague's racial discrimination action.  Shortly after Ms. Naz testified, her supervisor made explicit discriminatory comments that "non-native people" like Ms. Naz "have difficulty writing," and also, suddenly, began fiercely criticizing Ms. Naz's performance and conduct at work.  Again, the Government argues too much time passed between these explicit discriminatory statements and Ms. Naz's ultimate termination, but more significant reprisals, tainted by the prior discrimination, followed from Ms. Naz's other supervisors.  As alleged, Ms. Naz's subsequent supervisors held ill-feelings toward Ms. Naz and were more sympathetic to their fellow supervisor than they were to Ms. Naz.  They continued the discrimination against Ms. Naz, until finally, she was termination on the basis of discriminatory campaigned that was waged against her.

III.     Finally, Ms. Naz was denied promotions because of the alleged discrimination she experienced in violation of Title VII.  She alleged she was denied a salary increase that should have been "automatic."  The Government argues Ms. Naz failed to allege other employees received the step increase, but again, she alleged that the step increase was automatic, and it is therefore

reasonable to infer that *every* other employee who was eligible would have received it.  She also alleges Defendants-Appellees responded to an EEO complaint she filed against one of her supervisors by denying the automatic step increase.  That is sufficient to state a claim.  Ms. Naz was also disqualified from promotions because she was unfairly placed on performance improvement plans. The Government argues that she was placed on these plans because of poor work. But that was an impermissible jump to a conclusion, and it is reasonable to infer that Ms. Naz's poor performance reviews resulted from Defendants-Appellees' alleged discrimination, not her own shortcomings.

## ARGUMENT

**I.    MS. NAZ SUCCESSFULLY ALLEGED THAT SHE WAS RETALIATED AGAINST BECAUSE OF HER PROTECTED ACTIVITIES**

As the District Court did, the Government reasons that Ms. Naz's retaliation claim must fail because she does not establish a causal link between her testimony against Dr. Perl and her ultimate termination.  This narrow interpretation of Ms. Naz's Complaint ignores that she alleges a multi-year pattern of reprisals that began shortly after she testified against Dr. Perl.[1]

---

[1] The *amicus* agrees with the Government's assumption that retaliation claims are available to federal-sector employees under Title VII.  *See* 42 U.S.C. § 2000e-16(a) (federal personnel actions must be "free from any discrimination based on race, color, religion, sex, or national origin").

The Government is correct that Ms. Naz's termination occurred long after her testimony against Dr. Perl, but Ms. Naz alleges the retaliatory conduct began immediately after Dr. Perl learned of Ms. Naz's testimony against her. AA16 ¶ 8. She alleges that Dr. Perl learned of her testimony in April 2018 and that, in the same month, Dr. Perl suddenly threatened to fire Ms. Naz, *id.* ¶¶ 9-10; told Ms. Naz that "non-native people" like Ms. Naz "have difficulty" writing, *id.* ¶ 11; and screamed at Ms. Naz for booking a hotel, AA17 ¶ 12.

The Government tries to minimize the significance of these initial retaliatory acts by arguing they were not "materially adverse actions" within the meaning of Title VII. That ignores that these actions were, as alleged, the beginning of a pattern of discrimination against Ms. Naz. More significant retaliatory acts and reprisals followed from Dr. Perl and Ms. Naz's other supervisors in the months after Dr. Perl's initial discriminatory actions and comments. Dr. Perl denied Ms. Naz an Excel training in October 2018. AA18 ¶ 23. In November 2018, Ms. Naz's performance was unfairly criticized, and she was placed on a performance improvement plan. AA18 ¶¶ 30-33. More reprisals followed. Ms. Naz's telework and alternative work arrangements were taken away, AA18-21 ¶¶ 34, 57, 67, 72; and she was given (as she alleges) more unfair performance reviews, AA19-21 ¶¶ 39, 69.

The Government nevertheless rejects the significance of any temporal connection between Ms. Naz's testimony against Dr. Perl and the reprisals that followed because "Naz fails to make the predicate showing . . . that her supervisors had knowledge of [her] protected activity," Br. for Appellee (Oct. 16, 2024) at 32, even though this is exactly the kind of reasonable inference that should be drawn in Ms. Naz's favor. *See Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). She alleged that she enjoyed "an unblemished career of nearly two decades" before she suddenly began suffering adverse employment actions in April 2018 upon testifying against Dr. Perl. AA14 ¶ 1. Indeed, Ms. Naz alleges that she enjoyed a "cordial and productive relationship" with Dr. Perl prior to April 2018. AA16 ¶ 5. Given the sudden force of Dr. Perl's reaction against Ms. Naz in April 2018, and the absence of any prior complaint by Dr. Perl against Ms. Naz or her work, it is more than reasonable to infer that Dr. Perl learned of Ms. Naz's testimony for the first time in April 2018 and began retaliating against her as a result. It is likewise reasonable to infer that the retaliation continued after Dr. Perl was removed as Ms. Naz's supervisor. Ms. Naz's subsequent supervisors were aligned with Dr. Perl. The Complaint alleges they were friendly with Dr. Perl, had been told by Dr. Perl that Ms. Naz would just waste their "valuable time complaining" (after Ms. Naz had asked for transfer away from Dr. Perl), and were aware of Ms. Naz's protected activities. AA17

5

¶ 16, AA20 ¶¶ 49-50.  It is reasonable to infer that these supervisors disagreed with Ms. Naz's testimony against Dr. Perl and continued the pattern of reprisals against her.

Ms. Naz's testimony against Dr. Perl was also not her only protected activity that led to discriminatory retaliation.  She also filed two separate EEO complaints against Dr. Perl in December 2018 and against Mr. Gross, another supervisor, in October 2019.  The Government attempts to explain away any actionable retaliation connected to these complaints by pointing out that these supervisors had already taken adverse actions against her.  Br. for Appellee at 35-36.  But, again, this ignores that Ms. Naz was subject to a continuum of discrimination and that these protected activities led to their own close-in-time reprisals.  As alleged in the Complaint, Ms. Naz was caught in a vicious cycle.  She would complain about her treatment, plead for a transfer or ask for a career opportunity she was being denied, and her action would be met by reprisals by her supervisors.

For example, in the month *after* Ms. Naz filed an EEO complaint against Dr. Perl, Dr. Perl gave Ms. Naz a "deficient and untimely performance review," AA19 ¶ 39, and denied multiple trainings, *id.* ¶¶ 40-41.  A couple of months after Ms. Naz filed her EEO complaint against Mr. Gross, he denied her automatic salary increase.  AA21 ¶ 71.  Yes, by the time Ms. Naz filed her first Complaint against Dr. Perl in December 2018 she had already been reprimanded by Dr. Perl, placed

6

on a performance improvement plan, and lost her ability to telework.  AA017–18 ¶¶ 12, 30, 31, 33, 34.  But these actions were (it is reasonably alleged) taken in response to even earlier supervisor actions.  As explained above, *those* earlier reprisals occurred in the months after Ms. Naz's initial testimony against Dr. Perl. AA16-18.

Similarly, in October 2019, Ms. Naz filed an EEO complaint against a supervisor, Mr. Gross, and Mr. Gross denied her an "automatic" grade increase four months later in January 2020.  AA21 ¶¶ 70, 71.  The Government argues that Mr. Gross had already given Ms. Naz a negative performance review in September 2019, the month before she filed her complaint.  Br. for Appellee at 36 (citing AA21).  Again, however, this ignores that the September 2019 performance review was arguably a retaliatory event in and of itself.  Ms. Naz alleges that Mr. Gross announced during a meeting that Ms. Naz would be the only member of her team to report to her supervisor "for a long time."  AA020 ¶ 61.  She alleges that Mr. Gross began to harshly criticize and micromanage Ms. Naz beginning July 2019. AA021; Compl. ¶ 65.  And she avers that Mr. Gross began to bully her after July 2019.  Compl. ¶ 66.  Months after these events, Mr. Gross gave Ms. Naz a negative performance review.  Finally, in response, Ms. Naz filed an EEO complaint.  *Id.* ¶ 70.

Last, like the District Court, the Government fails to draw reasonable inferences in Ms. Naz's favor when it comes to her alleged negative performance. It is reasonable to infer that Ms. Naz's sudden streak of disciplinary actions resulted from the complained-of discriminatory retaliation, not her own shortcomings. And, regardless, "liability [cannot be avoided] just by citing some other factor that contributed to [a defendant's] challenged employment decision." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (emphasis omitted).[2] The question is, would the "outcome change[]" if Ms. Naz were not subject to discrimination? *Id.* Here, the answer is "yes."

---

[2] The Government believes the appropriate standard of causation for federal-sector Title VII claims is articulated in *Babb v. Wilkie*, 589 U.S. 399 (2020), which construed the federal-sector provision of the Age Discrimination in Employment Act. In contrast, *amicus* cites the Title VII causation standard articulated in *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). Under *Babb*, the protected activity "must be the but-for cause of [an employee's] differential treatment," but the differential treatment need not be "a but-for cause of the ultimate decision," so long as it played some part in the decision that was made. 589 U.S. at 407–08 (emphasis omitted). Ms. Naz's Complaint is sufficient under this standard as well. Her protected activities, including her testimony against Dr. Perl and her complaints against Dr. Perl and Mr. Gross, certainly "played some part" in the reprisals against her. It is unreasonable to infer that Ms. Naz suddenly became a terrible employee after a successful 17-year career. AA14 ¶ 1. Nevertheless, she was relentlessly criticized and eventually fired. All of this began shortly after her supervisor discovered her protected activity.

## II.  MS. NAZ SUCCESSFULLY PLED THAT HER TERMINATION WAS DISCRIMINATORY

The Government too quickly dismisses the continuum of discrimination that Ms. Naz experienced and how it led to her to termination.  Like the District Court, the Government concludes Ms. Naz's termination was too far removed from any discrimination she experienced in the aftermath of her testimony against Dr. Perl.  This ignores Ms. Naz's detailed allegations, which explain that she experienced a "sea change" in her career after she testified.  AA16 ¶ 8.  Thereafter, she experienced years of discrimination and reprisals, the final consequence of which was her termination.

Ms. Naz's story begins with the "unblemished career" she had prior to her testimony against Dr. Perl.  AA14 ¶ 1.  Ms. Naz successfully worked as an economist in the Department of Commerce for 17 years, before joining the Department of Energy.  AA014 ¶ 3.  After she joined the Department of Energy, she worked "capably and without critique" for more than a year.  *Id.* ¶ 7.  Indeed, Ms. Naz alleges that she enjoyed a "cordial and productive relationship" with Dr. Perl prior to April 2018.  AA16 ¶ 5.  The discrimination and criticism of her work, which was the ultimate justification for termination, did not begin until she testified against her supervisor.  The Government and the District Court ignore these allegations and the strong inferences that flow from them.  It is unreasonable to believe Ms. Naz suddenly became an employee worthy of termination after

9

almost two decades of successful federal service.  Something else must have changed and given the timing and comments from Ms. Naz's supervisors, and it is reasonable to infer the discrimination and animus against Ms. Naz led to unfair criticisms.

The Government makes the same mistake as the District Court by focusing on the explicit discriminatory statements made by Dr. Perl, when that was simply the beginning of the much longer pattern of discrimination that led to Ms. Naz's termination.  Ms. Naz alleges that Dr. Perl learned of Ms. Naz's testimony against her in April 2018 and that, in the same month, she suddenly threatened to fire Ms. Naz.  AA16 ¶¶ 9-10.  Again, this was after Ms. Naz had already worked for Dr. Perl without critique for more than a year.  AA14 ¶ 7.  That month, Dr. Perl also told Ms. Naz that "non-native people" like Ms. Naz "have difficulty writing," AA16 ¶ 11, and screamed at Ms. Naz for booking a hotel "within the acceptable [rate] range" for a conference, AA17 ¶ 12.  These were explicit discriminatory statements, but more significant reprisals, tainted by the prior discrimination, followed from Dr. Perl and Ms. Naz's other supervisors.  These included placing Ms. Naz on performance improvement plans, AA18-20 ¶¶ 30-33, 52; taking away telework and alternative work arrangements, AA18-21 ¶¶ 34, 57, 67, 72; and unfair performance reviews, AA19-21 ¶¶ 39, 69.  Dr. Perl specifically "badmouth[ed]"

Ms. Naz to these other supervisors, in part by telling them that Ms. Naz would "spend [their] valuable time complaining."  AA17 ¶ 16.

Despite this continuum of discrimination, the Government still argues that too much time had passed between the explicit discrimination and the ultimate decision to terminate her.  Even after Dr. Perl was removed as her supervisor, Messrs. Turnure and Gross, her subsequent supervisors, continued the pattern of discrimination that led to Ms. Naz's termination.  AA19-21 ¶¶ 47, 50-56, 60-69. As alleged, they were sympathetic to Dr. Perl and held ill-feelings toward Ms. Naz. *Id.*  Title VII's "but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause."  *Bostock*, 590 U.S. at 656.[3]  From this mandate, the analysis should be simple here:  Had Dr. Perl not begun a discriminatory campaign against Ms. Naz, it could not have been later continued by her subsequent supervisors, and Ms. Naz would have never been terminated.  This is especially true given how Ms. Naz's negative reviews built on each other over time and gave the Department the ultimate justification for terminating Ms. Naz.

---

[3] This would not be any different under the causation standard articulated in *Babb*. In *Babb*, the Court explained that the federal-sector causation standard for Age Discrimination Act claims is consistent with the private-sector causation standard for Title VII articulated in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013).  *See* 589 U.S. at 411.

### III.    MS. NAZ SUCCESSFULLY PLED THAT SHE WAS DENIED PROMOTIONS DUE TO DISCRIMINATION

Ms. Naz plausibly alleged that she was denied promotions and then fired because discrimination based her race, sex, religion, or national origin.

### A.    Ms. Naz Was Denied an "Automatic" Step Increase

The Government fights the Complaint's allegation that Ms. Naz was denied an "automatic" step increase because of Defendants' discrimination.  AA21 ¶ 71. It argues that just because a step increase is "automatic" does not mean employees with "similar qualifications" receive it.  *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003).  But that is exactly the most reasonable inference to draw when learning a promotion is "automatic," because definitionally every employee that is eligible for the promotion would mechanically and inevitably receive it.  Indeed, there are only "three requirements established by law" that Ms. Naz had to meet: (1) her performance had to be "at an acceptable level of competence"; (2) she had to complete the required waiting period; and (3) she must not have received an equivalent increase during the waiting period.  5 C.F.R. § 531.404; *see also* 5 U.S.C. § 5335.  With these requirements in mind, it is clear what Ms. Naz meant when she alleged that she was denied an "automatic" step increase.  She went through the required waiting period but was nevertheless denied the expected step increase because her supervisor said her performance was not at an acceptable level.  The Government and District Court's strict reading of Ms. Naz's shorthand

12

is exactly the kind of narrow construction that the Supreme Court has cautioned against when it comes to *pro se* litigants. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal citations omitted).

The Government argues that Ms. Naz was not even eligible for a step increase because of her alleged performance issues. But Ms. Naz's Complaint repeatedly makes clear that she was given unfair poor performance reviews because of the discriminatory campaign against her. She alleges that had a successful 17-year career at Department of Commerce before going to the Department of Energy. AA14 ¶ 3. She then points out that she "performed her job capably and without critique for [her] first two years at the Department of Energy," until she testified against her first supervisor, Dr. Perl. AA14 ¶ 7, AA16 ¶¶ 1-2. From that point forward, Ms. Naz was singled out and incessantly and unfairly critiqued by Dr. Perl and her other supervisors or otherwise set up to fail. For example, the Complaint alleges Mr. Gross, the supervisor who denied Ms. Naz's step increase, sent unclear and contradictory instructions. AA21 ¶ 63. In other words, Ms. Naz was a model employee for almost two decades until she decided to testify against her supervisor in an EEOC hearing, and then – suddenly – she

13

deserved constant criticism.  Ms. Naz's poor performance evaluation cannot be wielded against her given the allegations in the Complaint.

### B.    Ms. Naz Was Denied Opportunities for Promotion

Ms. Naz was also disqualified from promotions because of her placement on performance improvement plans.  The Government argues that Ms. Naz's claim must still fail because she did not allege which specific promotions she was denied. That is not the reason the District Court denied Ms. Naz's claim.  It denied her claim because the Government allegedly had a "legitimate reason" to prevent Ms. Naz from applying for promotions, AA316, namely, her alleged purported underperformance.  As explained above, the District Court (and the Government) should have drawn inferences in Ms. Naz's favor.  *See Maljack*, 52 F.3d at 375. Ms. Naz worked successfully at the Department of Energy for years before being subject to negative performance reviews.  AA014 ¶ 3.  Those negative performance reviews only started after she testified against her supervisor, as the pattern of discrimination against her unfolded.  AA014 ¶¶ 3-7, AA016 ¶ 8.  It is reasonable to infer that Ms. Naz's sudden streak of poor performance resulted from the complaints of discrimination, not her own shortcomings.  Regardless, Ms. Naz was not required to mention specific opportunities, only that there was a job vacancy.  *Accord Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650-51

14

(D.C. Cir. 2003) (explaining there cannot be an "absence of a vacancy in the job sought").

### C.    Ms. Naz Was Denied Transfers

Finally, Ms. Naz alleged that she was denied transfers, which constitute Title VII violations. *See Chambers v. Dist. of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022). The Government argues that Ms. Naz's claim is "undeveloped," but this places too high a burden on Ms. Naz as a *pro se* plaintiff. As a *pro se* litigant, the allegations in her Complaint should be read liberally to avoid cutting off meritorious claims. *See Erickson*, 551 U.S. at 94. Ms. Naz alleged her immediate supervisor Dr. Perl began suddenly discriminating against her in April 2018. AA016. That month, Dr. Perl told Ms. Naz that "non-native people," like Ms. Naz, "have difficultly" writing and asked whether she attended school in the United States. *Id.* ¶ 11. She also screamed at Ms. Naz and unfairly threatened to fire her over a reasonable hotel reservation. AA017 ¶ 12. Ms. Naz requested a transfer away from Dr. Perl that same month, which was denied. *Id.* ¶¶ 14, 15. Dr. Perl poisoned the well with Ms. Naz's other supervisors, in part by telling them that Ms. Naz would "spend valuable time complaining." *Id.* ¶ 16. She later requested another transfer in November 2018, several months later, which was also denied. AA018 ¶ 29. Ms. Naz has, in sum, alleged she was denied transfers immediately after being discriminated against. This is enough to state a claim.

## CONCLUSION

The District Court's decision to dismiss Ms. Naz's Complaint for failure to state a claim should be reversed, and the case should be remanded to the District Court for proceedings on the merits.

November 6, 2024                    Respectfully submitted,

                                   /s/ Anthony F. Shelley
                                   Anthony F. Shelley
                                   Cody F. Marden (*application pending*)
                                   MILLER & CHEVALIER CHARTERED
                                   900 Sixteenth St., NW
                                   Black Lives Matter Plaza
                                   Washington, DC 20006
                                   Telephone: (202) 626-5800
                                   Facsimile: (202) 626-5801
                                   Email:  ashelley@milchev.com
                                   Email:  cmarden@milchev.com

                                   *Court-Appointed Amicus Curiae*

16

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

### **Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

XX this brief contains 3,668 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

___ this brief uses a monospaced typeface and contains [*state the number of lines*] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

XX this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point font in Times New Roman, or

___ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

November 6, 2024                     */s/ Anthony F. Shelley*
                                     Anthony F. Shelley

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2024, I electronically filed the foregoing **REPLY BRIEF OF COURT-APPOINTED *AMICUS CURIAE* IN SUPPORT OF APPELLANT** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Matthew M. Graves
> Brian P. Hudak
> Jane M. Lyons
> Johnny H. Walker
> U.S. Attorney's Office for the District of Columbia
> 601 D Street NW
> Washington, DC 20530
> matthew.graves@usdoj.gov
> brian.hudak@usdoj.gov
> jane.lyons@usdoj.gov
> johnny.walker@usdoj.gov

I further certify that on November 6, 2024 I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants, addressed as follows:

> Farah Naz
> 13414 Ansel Terrace
> Germantown, MD 20874
>
> *Pro Se Appellant*

　　　　　　　　　　　　　　　　　　　*/s/ Anthony F. Shelley*